# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| NICHOLAS L. ZAMMER | : | |
| Plaintiff, | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| HERMAN MILLER, INC. | : | No. 10-922 |
| Defendant. | : | |

## MEMORANDUM

**Schiller, J.**                                                                                                              **June 22, 2010**

In a five-count Complaint, Plaintiff seeks judicial declarations that an arbitration provision he signed with Defendant is unilaterally revocable and that the non-compete provision he signed with Defendant is unreasonable. Additionally, Plaintiff alleges breach of contract, fraud, and promissory estoppel. Currently before the Court are Defendant's Motion to Stay and Compel Arbitration, and its Motion to Dismiss Plaintiffs' Claims for Fraud and Promissory Estoppel. For the reasons stated below, the Court will grant Defendant's Motion to Stay and Compel Arbitration and will not comment on Defendant's Motion to Dismiss.

## I.     BACKGROUND

In 1986, Plaintiff Nicholas Zammer, a Pennsylvania citizen, began working as a salesman for Defendant Herman Miller, Inc. ("HMI"), a Michigan corporation that sells office furniture and equipment. (Am. Compl. ¶¶ 4–6.) He left HMI in 2001, but returned in 2003, when he was named President of Herman Miller-OP, Spectrum, LLP ("Spectrum"), an authorized HMI contract furniture dealer with a showroom in King of Prussia, PA. (*Id.* ¶¶ 5, 8.)

In 2003, HMI launched the "Earn In Program," ("EIP") which allowed dealers running HMI

showrooms to purchase the dealership they ran via a stock sale over a five year period, provided the dealers put up a cash deposit and met certain performance goals. (*Id.* ¶ 23.) HMI would establish a "goodwill price" for the dealership by averaging the dealership's revenue over the prior two years and asking for a percentage of that number. (*Id.* ¶ 26.) Certain qualitative and quantitative factors could act to reduce the goodwill price. (*Id.*) Although the purported purpose of the EIP was to encourage entrepreneurial behavior, Plaintiff alleges that, in fact, HMI designed the EIP to dispose of failing dealerships for which HMI had overpaid and could not sell. (*Id.* ¶¶ 24–25.)

On July 14, 2006, Zammer accepted HMI's invitation to participate in the EIP. (*Id.* ¶ 27.) Zammer signed a "Letter of Intent" with HMI and put down a $75,132 deposit toward the purchase of the Spectrum dealership, which was refundable if the Letter of Intent was terminated by either party before the dealership was sold. (*Id.* ¶¶ 31–32.) The Letter of Intent did not include an arbitration provision. (Pl.'s Mem. in Opp'n to Def.'s Mot. to Compel Arb. and Stay Proceedings at 4.)

Concurrent with the execution of the Letter of Intent, Zammer and HMI also entered into a "Compensation Agreement." (Am. Compl. ¶ 33.) The Compensation Agreement provides that HMI could terminate the agreement for cause (and thus refund only half of the "bonus funds" Zammer had on deposit with HMI) if for two consecutive years, Zammer failed to meet HMI's sales goals or to achieve 3% adjusted operating income ("AOI"). (Am. Compl. ¶ 34; *Id.* Ex. B [Compensation Agmt.] ¶ 10.) The Compensation Agreement contained an arbitration clause, providing that "[a]ny dispute arising out of the interpretation or application of this Agreement shall be submitted to binding arbitration pursuant to the rules of the American Arbitration Association." (*Id.* ¶ 21.) The Compensation Agreement also contained a choice of law clause that provided that it would be

governed by the laws of the State of Michigan. (*Id.* ¶ 15.)

Zammer alleges that HMI executives, including the CEO, repeatedly assured him that HMI would "do the right thing" and do everything possible to ensure that he would be able to purchase the Spectrum dealership, including making "mid-course corrections" during the performance of their agreement. (Am. Compl. ¶¶ 28–29.) He also alleges that HMI told him and other participants in the EIP to "'trust' HMI implicitly and not to be concerned about the terms of their respective contracts with HMI." (*Id.* ¶ 29.)

Zammer contends that the EIP was plagued with problems from its inception. He claims that the metrics used to calculate the "goodwill price" for the dealership were arbitrary to begin with and were changed over time to benefit HMI. (*Id.* ¶ 35.) HMI pressured Zammer to increase market share, often at the expense of the AOI goals he needed to meet as a condition of the EIP. (*Id.* ¶ 36.) For example, HMI's regional manager insisted that Zammer offer customer pricing well below Spectrum's average operating expenses and threatened to withhold competitive discounting for the Spectrum dealership if Zammer refused. (*Id.* ¶ 37.) Furthermore, HMI allegedly rejected Zammer's plan to reduce Spectrum's operating expenses, instead requiring him to cut employees' salaries and hours, thereby reducing morale and productivity. (*Id.* ¶ 38.)

On December 1, 2009, HMI terminated the Compensation Agreement and Zammer's participation in the EIP, claiming that Zammer had failed "to achieve three percent (3%) adjusted operating income for two consecutive years in accordance with Section 10 of the Compensation Agreement." (Def.'s Mot. for Stay and to Compel Arbitration Ex. D [Termination Letter].)

On March 3, 2010, Zammer brought the present lawsuit asserting five claims. Count I seeks a declaratory judgment that the arbitration provision in the Compensation Agreement is unilaterally

revocable. Count II seeks a declaratory judgment that the non-compete provision in the Compensation Agreement is unreasonable and, therefore unenforceable. Count III asserts a claim for breach of contract arising from HMI's alleged breaches of the Compensation Agreement and Letter of Intent, as well as breach of alleged oral agreements made subsequent to the execution of the two written agreements. Count IV asserts a claim for fraud arising from HMI's alleged misrepresentations to Zammer in inducing him to enter into (and continue his participation in) the EIP. Count V asserts a claim for promissory estoppel.

On April 12, 2010, HMI filed a motion to stay and compel arbitration, as well as a motion to dismiss Zammer's claims for fraud and promissory estoppel.

## II. STANDARD OF REVIEW

A motion to compel arbitration calls for a two-step inquiry into (1) whether a valid agreement to arbitrate exists and (2) whether the particular dispute falls within the scope of that agreement. *Trippe Mfg. Co. v. Niles Audio Corp.*, 401 F.3d 529, 532 (3d Cir. 2005). When determining the scope of an arbitration agreement, there is a presumption in favor of arbitrability. *Id.*

## III. DISCUSSION

The parties do not dispute that the Compensation Agreement contains an arbitration provision. They disagree, however, on whether that arbitration agreement is unilaterally revocable and, if not, whether it applies to all of Plaintiff's claims.

### B. Unilateral Revocability

4

HMI argues that, because the Compensation Agreement contains an arbitration clause, Zammer must arbitrate his grievances and this case must be stayed pending resolution of that arbitration. Zammer counters that the arbitration provision in the Compensation Agreement is unilaterally revocable and that he may continue the present litigation because he has revoked his agreement to arbitrate.

The threshold question is therefore whether the arbitration agreement is unilaterally revocable. Citing the Compensation Agreement's choice of law clause, both parties initially point the Court to Michigan law. The Michigan Arbitration Act (MAA) states that:

> A provision in a written contract to settle by arbitration under this chapter, a controversy thereafter arising between the parties to the contract, with relation thereto, and in which it is agreed that a judgment of any circuit court may be rendered upon the award made pursuant to such agreement, shall be valid, enforceable and irrevocable save upon such grounds as exist at law or in equity for the rescission or revocation of any contract. Such an agreement shall stand as a submission to arbitration of any controversy arising under said contract not expressly exempt from arbitration by the terms of the contract. Any arbitration had in pursuance of such agreement shall proceed and the award reached thereby shall be enforced under this chapter.

MICH. COMP. LAWS § 600.5001(2). So-called "statutory arbitration" agreements—those that comply with the requirements of section 600.5001—are, as noted in the statutory text, "irrevocable save upon such grounds as exist at law or in equity for the rescission or revocation of any contract." *Id.* However, the Michigan Supreme Court also recognizes "common law arbitration" agreements, which are unilaterally revocable before an arbitrator issues an award. *Wold Architects & Eng'rs v. Strat*, 713 N.W.2d 750, 755 (Mich. 2006). Agreements to arbitrate that do not conform to the requirements of § 600.5001—because, for example, they do not specify that a judgment of any circuit court may be rendered upon the arbitration award—are considered to be agreements for

5

common law arbitration under Michigan law.

Although a district court sitting in its diversity jurisdiction ordinarily applies state substantive law pursuant to the *Erie* doctrine, in cases within the reach of the Federal Arbitration Act ("FAA"), federal substantive arbitration law applies. *Preston v. Ferrer*, 552 U.S. 346, 349 (2008) (citing *Southland Corp. v. Keating*, 465 U.S. 1, 16 (1984)). The parties agree that the FAA applies to this case. Therefore, this Court will analyze Defendant's Motion to Compel Arbitration under federal law.

The FAA states that

> A written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2. According to HMI, the parties agreed to arbitration and Zammer therefore must arbitrate his claim. Zammer, however, claims that the FAA does not compel arbitration here. He contends that the contracting parties agreed to incorporate Michigan state law into their arbitration provision, including Michigan's common law of arbitration. (Pl.'s Mem. in Opp'n to Def.'s Mot. to Compel Arb. and Stay Proceedings at 14). He argues that the FAA is designed to ensure that courts effectuate the intent of the parties with respect to arbitration, and that the parties here intended to contract for unilaterally revocable arbitration.

Though the FAA contains no express preemptive provision and does not evince a Congressional intent to occupy the entire field of arbitration law, state law that "'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress'" are preempted by the FAA. *Volt Info. Sci., Inc. v. Bd. of Trs. of Leland Stanford Jr. Univ.*, 489 U.S.

6

468, 477 (1989) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)). The FAA was designed to "place an arbitration agreement 'upon the same footing as other contracts, where it belongs,' and to overrule the judiciary's longstanding refusal to enforce agreements to arbitrate." *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 219–20 (1985) (quoting H.R. Rep. No. 96, 68th Cong., 1st Sess., 1 (1924)). Michigan's common law arbitration is precisely the kind of obstacle to enforcement of arbitration awards that the FAA was designed to displace. It has long been understood that the effect of section 2 of the FAA is to "reverse antiquated state rules of law that made arbitration agreements revocable at will any time prior to the issuance of the arbitration award." 21 SAMUEL WILLISTON & RICHARD A. LORD, A TREATISE ON THE LAW OF CONTRACTS § 57:5 (4th ed. 2001) (*hereinafter* Williston); *Johnson Controls, Inc. v. City of Cedar Rapids*, 713 F.2d 370, 376 (8th Cir. 1983); *see also Allied-Bruce Terminix Co. v. Dobson*, 513 U.S. 265 (1995) ("[T]he basic purpose of the Federal Arbitration Act is to overcome courts' refusals to enforce agreements to arbitrate."). The Michigan Supreme Court's decision in *Wold* erects a barrier to enforcing arbitration agreements that contravenes the national policy favoring arbitration. *Wold* requires that parties who seek to create a binding agreement to arbitrate—one that cannot be unilaterally revoked—include certain magic words stipulating that judgment may be entered upon the arbitrator's award. In doing so, the Michigan Supreme Court set a "trap for the unwary," leaving many parties who undoubtedly believed they were signing up for binding arbitration subject to litigation at any time before an arbitration award is handed down, thus frustrating their expectations. *Wold*, 713 N.W.2d at 764 (Corrigan, J., concurring). General principles of contract law do not allow for unilateral revocation of a contract term. *See id.*; 29 Williston § 73:15 ("Contracts may ordinarily be modified or terminated by a subsequent agreement of the parties. Cancellation of a contract also requires mutual

7

assent."). "When a state law adds a requirement to make an arbitration clause enforceable and irrevocable beyond the requirements for any other contractual clause to be enforceable and irrevocable, the FAA preempts that state requirement." *Mechanical Power Conversion, L.L.C. v. Cobasys, L.L.C.*, 500 F. Supp. 2d 716, 720 (E.D. Mich. 2007). The Michigan Supreme Court's decision in *Wold* adds just such a requirement exclusively to arbitration agreements and therefore contravenes the FAA.

Zammer points to the Supreme Court's decision in *Volt*, charging that the Supreme Court allows parties to incorporate state law into their arbitration agreements and that the FAA does not preempt the application of such state law. In *Volt*, the contracting parties agreed to arbitrate any disputes arising out of their contract and agreed that California law would govern such proceedings. *Volt*, 489 U.S. at 470. Unlike the FAA, the California Arbitration Act contained a provision allowing a court to stay arbitration pending resolution of related litigation. *Id.* A dispute arose between the parties, whereupon Volt demanded arbitration. *Id.* Meanwhile, Stanford University filed a lawsuit in California Superior Court against Volt and two other parties with whom it did not have an arbitration agreement. *Id.* at 470–71. Volt petitioned the court to compel arbitration, which the court denied, choosing instead to stay the arbitration pending the outcome of the related litigation. *Id.* at 471. The California Court of Appeals affirmed, as did the United States Supreme Court.

First, the Supreme Court rejected Volt's argument that the decision below was tantamount to a finding that Volt had waived a federally protected right to compel arbitration. *Id.* at 474–75. The Court stated that "§ 4 of the FAA does not confer a right to compel arbitration of any dispute at any time; it confers only the right to obtain an order directing that 'arbitration proceed in the

manner provided for in [the parties'] agreement.'" *Id.* (alteration in original). Second, the Supreme Court rejected Volt's argument that the state court's decision contravened the federal policy favoring arbitration, as articulated in *Moses H. Cone Memorial Hospital v. Mercury Construction Corporation*, 460 U.S. 1, 24–25 (1983). The *Volt* Court explained:

> There is no federal policy favoring arbitration under a certain set of procedural rules; the federal policy is simply to ensure the enforceability, according to their terms, of private agreements to arbitrate. Interpreting a choice-of-law clause to make applicable state rules governing the conduct of arbitration—rules which are manifestly designed to encourage resort to the arbitral process—simply does not offend the rule of liberal construction set forth in *Moses H. Cone*, nor does it offend any other policy embodied in the FAA.

489 U.S. at 476.

Zammer suggests that *Volt* stands for the proposition that the FAA allows parties to incorporate state law into their arbitration provisions and that, having done so, the parties can no more be forced to arbitrate against the will of either one of them than if the parties had explicitly stated in their contract that the arbitration agreement was unilaterally revocable. (Pl.'s Mem. in Opp'n to Def.'s Mot. to Compel Arb. and Stay Proceedings at 15.) In this respect, Zammer is mistaken.[1]

While *Volt* teaches that, in certain circumstances, parties can incorporate state rules governing the conduct of arbitration into their arbitration agreements, it does not allow parties to incorporate into their agreements state law that "'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Volt*, 489 U.S. at 477 (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)). Though the Court in *Volt* stated that "the federal policy [of

---

[1] The Court need not determine whether the result here would be different had the parties explicitly noted in the wording of their contract their desire to contract for a right to unilaterally rescind their agreement to arbitrate.

the FAA] is simply to ensure the enforceability, according to their terms, of private agreements to arbitrate," it immediately thereafter noted that California's rule allowing arbitration to be stayed pending related litigation did not offend any policy embodied in the FAA. *Id.* at 476. The implication of this reasoning is that when parties agree that their contract involving interstate commerce will be governed by the law of a particular state, they do not incorporate into their agreement state law provisions that contravene the FAA. Clearly, a court would not have to require parties to submit their dispute to an administrative proceeding as a prerequisite to arbitrating, even if the parties had agreed to incorporate the law of a state that purported to require such an administrative prerequisite to arbitration. *Cf. Preston*, 552 U.S. at 349–50 (holding that when parties agree to arbitrate all questions arising under a contract, state laws lodging primary jurisdiction in another forum, whether judicial or administrative, are superseded by the FAA).

While the state law provision at issue in *Volt* simply affected the question of when arbitration would take place (i.e. during or after related judicial proceedings), the Michigan state law relevant in this case addresses the issue of whether arbitration will take place at all. This strikes at the heart of the FAA. Though there is "no federal policy favoring arbitration under a certain set of procedural rules" there is a federal policy of enforcing arbitration agreements generally. *See Volt*, 489 U.S. at 476. As noted above, the Michigan Supreme Court's decision in *Wold* represents the exact kind of hostility to the enforcement of arbitration agreements that the FAA was designed to combat. Therefore, the FAA preempts Michigan's law governing common law arbitration.

### C. What Claims are Subject to the Arbitration Provision?

Zammer argues that, even if the Compensation Agreement calls for binding arbitration, not all of his claims arise from the Compensation Agreement and therefore the other claims should

10

proceed in this Court. He argues that Count III asserts a claim for breach of contract of both the Compensation Agreement (which contains an arbitration clause) and the Letter of Intent (which has no arbitration clause). Furthermore, Counts IV and V charge HMI with fraud and promissory estoppel based on its conduct related to the EIP. Zammer contends that the arbitration provision in the Compensation Agreement does not cover his claims with respect to the EIP, and therefore that a stay of the current proceedings is unwarranted. (Pl.'s Mem. in Opp'n to Def.'s Mot. to Compel Arb. and Stay Proceedings at 20.) HMI counters that the EIP and the Compensation Agreement are inextricably linked and that arbitrating some claims in Michigan while litigating others here would be wasteful and duplicative.

> The Letter of Intent states, in part:
>
> It is the intent of [Zammer] and HMI to negotiate [Zammer's] purchase of all of the shares of stock and other equity of the Dealer (the Transaction) substantially on the terms and conditions of Exhibit A. The Transaction will be set out in written definitive agreements that are consistent with this Letter of Intent and satisfactory to the parties.

(Compl. Ex. A [Letter of Intent].) The Letter of Intent, by its own terms, "sets forth the understanding between [HMI and Zammer] with respect to the proposed transaction" in which Zammer would purchase the Spectrum Dealership. (*Id.*) The Compensation Agreement established a plan by which HMI would pay bonus money to Zammer, which the Compensation Agreement noted was "specifically created to facilitate [Zammer's] purchase of [the Spectrum dealership]." (Compl. Ex. B [Compensation Agreement].) The Letter of Intent also defined the Compensation Agreement as a "related agreement." (Letter of Intent.)

The Court disagrees with Zammer's suggestion that the legal and factual issues associated with the Compensation Agreement are independent of the legal and factual issues involved in the

EIP. As Zammer noted in his Amended Complaint, "Mr. Zammer entered into the Earn In Program by executing a Letter of Intent and Compensation Agreement dated July 14, 2006." (Am. Compl. ¶ 75.) Thus, the Letter of Intent is clearly related to the EIP and not separable therefrom. The arbitration agreement states that "[a]ny dispute arising out of the interpretation or application of this Agreement shall be submitted to binding arbitration." (Compensation Agreement ¶ 21.) HMI's purported reason for terminating its relationship with Zammer was the latter's failure to achieve "three percent (3%) adjusted operating income for two consecutive years in accordance with Section 10 of the Compensation Agreement." (Compl. Ex. C [Termination Letter].) Therefore, any resolution of Zammer's grievances will require an interpretation of the Compensation Agreement and thus the grievances falls within the scope of the arbitration agreement.

### D. HMI's Motion to Dismiss

Having determined that an agreement to arbitrate exists and that Zammer's Amended Complaint falls within the scope of that agreement, the Court will not address the merits of Zammer's claims, leaving those issues to the arbitrator.

## IV. CONCLUSION

For the reasons stated above, the Court grants HMI's Motion to Stay and Compel Arbitration and denies HMI's Motion to Dismiss. An appropriate order will be docketed separately.